**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**SPRINGDALE SCHOOL DISTRICT**                                                                 **PLAINTIFF**

**v.**                                        **CASE NO. 5:24-cv-05131-TLB**

**E.C. and M.H.,**
**as Parents of EH, a Minor**                                                                 **DEFENDANTS**

<u>**COMPLAINT**</u>

Plaintiff, Springdale School District (the "District"), by and through its attorneys, Friday, Eldredge & Clark, LLP, and for its Complaint against Defendants, E.C. and M.H., as Parents of EH, a Minor, states as follows:

**I.        PARTIES, JURISDICTION, AND VENUE**

1.        This Complaint seeks the review and reversal of the findings and decision of the administrative hearing officer in a due process hearing brought under the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400, *et seq.*

2.        The District is a public school district organized and operating pursuant to the laws of the State of Arkansas, and is a party aggrieved by the Hearing Officer's Final Decision and Order (the "'Decision") in IDEA Case No. H-24-21 before the Arkansas Department of Education (the "Hearing").

3.        Defendants E.C. and M.H. ("Parent" or "Parents") were the petitioners for the Hearing, who filed the complaint initiating the Hearing (the "Due Process Complaint") in their capacity as parents of E.H., a minor ("Student"). Parents and Student both are individuals residing within the Springdale School District in Washington County, Arkansas.

4.     This Court has subject-matter jurisdiction over the District's Complaint pursuant to 20 U.S.C. § 1415(i)(2)(A).

5.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 139l(b)(l), (2).

## II.     FACTUAL BACKGROUND

6.     Student began attending the District in second grade during the 2020-2021 school year on approximately October 2, 2020, during the COVID pandemic.

7.     Student began in the District at the Don Tyson School of Innovation ("DTSOI"), also known as the Virtual Innovation Academy, where she received virtual instruction during COVID pursuant to an individualized education plan ("IEP").

8.     The IEP originally was developed when Student was enrolled at the Arkansas Virtual Academy Charter School, prior to her enrollment in the District.

9.     Student continued at DTSOI into third grade for the 2021-2022 school year, at which point Student's IEP was amended.

10.     During third grade, Student's Parents were encouraged to bring Student to a physical school building for in-person schooling.

11.     The IEP team determined that Hunt Elementary housed a self-contained classroom appropriate for Student's education, and as a result, Parent visited the school and classroom prior to enrollment.

12.     Parents agreed with the placement at Hunt Elementary.

13.     In preparation for return to in-person schooling, a reevaluation was conducted by Dr. Robin Marsh on October 18, 2021, and a new IEP was developed for Student on October 21, 2021. Student then was enrolled in a self-contained classroom at Hunt Elementary.

14.     Student's IEP was amended on November 12, 2021, and March 4, 2022.

15.     During Student's third grade year (2021-2022) Student's progress report showed that her goals were continued. During this year, Student was absent from classes for 54 of 82 total days, nearly two-thirds of the school year.

16.     During Student's fourth grade year (2022-2023) student's goals were again continued. During this year, Student was absent from classes for 49 of 76 total days, again nearly two-thirds of the school year.

17.     During Student's fifth grade year (2023-2024), Student's instructor noted that Student was making "really good progress." Student's progress was reported to the Parent at IEP meetings and in IEP documents.

18.     On October 6, 2023, the School reported to Parent that Student had self-inflicted bruising from a tantrum in the classroom. Parent asked for an investigation. Springdale Police Department conducted an investigation and found no wrongdoing.

19.     An IEP annual review was scheduled for October 16, 2023. Parent refused to attend the meeting. The District attempted at least five times to schedule IEP meetings with the Parents between October 9 and November 6, 2023 to no avail.

20.     After October 6, 2023, Parents refused to return Student to school and refused to meet regarding Student's IEP.

### III.     THE DUE PROCESS COMPLAINT AND HEARING

21.     Parents filed the Due Process Complaint on November 9, 2023. *See generally* Due Process Complaint, a copy of which is attached hereto as **Exhibit A**.

22.     The Due Process Complaint alleges that the District violated the procedural and substantive requirements of the IDEA and failed to provide Student a free, appropriate public education ("FAPE").

23. The Due Process Complaint presented the following issues to the hearing officer:

    a. Whether the District denied Student a FAPE during the 2021-2022; 2022-2023; and 2023-2024 school years; and whether the IEP for the 2023-2024 school year is necessary and appropriate?

    b. Whether the District should be ordered to pay for Student's placement at a private school?

24. During the hearing, Parents also argued that the District failed to report Student's actual progress to Parents and this constituted a procedural violation that denied Student her educational benefits and impeded Parents opportunity for meaningful participation.

25. As to the 2021-2022 school year, Parents contend that the District failed to carry out proper testing and evaluation to determine Student's needs and abilities, failed to provide ABA therapy, and failed to properly monitor Student's progress.

26. As to the 2022-2023 school year, Parents contend that the District failed to use the appropriate learning tools for Student, failed to provide progress reports on Student's goals and objectives, and improperly used the same goals that Student had at age 5 for 4th and 5th grade instruction.

27. As to the 2023-2024 school year, Parents argue that Student's objectives were not properly updated from fourth grade, that Student was not being cared for properly by the school based on the events of October 6, 2023, and that the District failed to set an IEP meeting to address the October 6 events.

28. Finally, Parents argue that the events on October 6, 2023, necessitated Student's placement in a private school.

29.     On March 29, 2024, the Hearing Officer issued a Decision in this matter after hearing witness testimony on February 13-15, 2024. *See generally*, Hearing Officer Decision, a copy of which is attached as **Exhibit B**).

30.     The Decision addressed the following issues:

a.     Whether District denied Student a FAPE in violation of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C. §§ 1400-1485, as amended (IDEA) from November 9, 2021, through November 9, 2023, by failing to develop and implement appropriate Individualized Education Programs (IEPs) for Student for the third, fourth, and fifth grades;

b.     Whether District denied Student a FAPE when it placed Student in a self-contained classroom without making an appropriate determination of least restrictive environment; and

c.     Whether District should be required to pay for Student to attend a private school. (Ex. B at pp. 2)

### IV.     THE DECISION

31.     The Decision first identifies the statutory timeline for Parents' Due Process Complaint as "beginning on November 9, 2021, a few months into Student's third-grade year" and provides facts prior to that date for background purposes only (Ex. B at pp. 4-8).

32.     The Decision found that the District did not violate the IDEA with regard to the procedural violations alleged in the Due Process Complaint (*Id*. at pp. 16). Specifically, the District made proper progress reports to Parents in Students IEP report and IEP meetings.

33.     The Decision found that there was no denial of FAPE during the Student's fifth grade year (2023-2024 school year) because Student's Parents refused to attend the scheduled IEP meetings. (*Id*. at pp. 19-20).

34.     The Decision denied Parents' request for payment of private school costs for Student. (*Id*. at pp. 22-23).

35.     The Decision holds that the District denied Student a FAPE during the 2021-2022 and 2022-2023 school years because "her third and fourth grade IEPs were not reasonably calculated to enable Student to make progress appropriate in light of her circumstances." (*Id*. at pp. 19).

36.     Finally, the Decision holds that the District made a unilateral decision to place Student at Hunt Elementary, and this decision constituted a denial of FAPE in a "least restrictive environment." (*Id*. at pp. 20-21).

37.     Regarding the determination that the District denied student a FAPE from 2021-2023, the Decision bases this holding on the alleged improper reevaluation by Dr. Robin Marsh. The Decision notes in relevant part:

    a.    "The IEPs developed for the third and fourth grade (2022 and 2023 school years) quoted heavily from the 2018 evaluation and the 10/18/21 reevaluation. Programming decisions were made for the third grade based on the IQ assessment of 40 made when student was three years old. Her progress on goals was minimal. By the end of the fourth grade, she was still considered as being at a kindergarten to first grade level." (*Id*. at pp. 19).

    b.    "Dr. Marsh did not personally observe Student for the reevaluation . . . Marsh's and the IEP team's review of existing data did not yield accurate information. In light

of the difficulties of using standardized assessments to evaluate Student, personal observation would become even more important." (*Id*. at pp. 18).

    c. "For the reasons stated above, the 10/18/21 reevaluation was insufficient to for the team to determine the nature and extent of Student's educational needs." (*Id*. at pp. 19).

38. Regarding the District's failure to provide the least restrictive environment, the Decision states:

    a. "District made the placement decision unilaterally, and the IEP team accepted the placement without properly evaluating Student, observing Student in any educational setting, or contemplating any other placement option than the pre-ordained self-contained classroom." (*Id*. at pp. 20-21).

    b. "The placement should be (1) determined at least annually; (2) based on the child's IEP; and (3) as close as possible to the child's home. Smith Elementary was the school that Student would normally attend based on her residence . . ." (*Id*. at pp 21).

39. The Decision orders the District to:

    a. Pay for an independent comprehensive evaluation of Student that complies with 34 CFR 200.204(c)(6), and that includes the assessments set forth in the Department's Eligibility Criteria & Program Guidelines for children with Autism. The independent evaluation shall be conducted within 45 days of the date of this Order and shall be conducted by a qualified examiner of Parent's choice;

    b. Pay for functional behavioral analysis conducted by a BCBA of parent's choice who will develop (1) an Individual Behavior plan for Student, and (2) a plan for

transitioning Student back to School, which may include a trauma-trained RBT to work with Student in the Educational environment under the BCBA's supervision, at District's expense.

c.  Include the Individual Behavior Plan in Students IEP and the BCBA as a member of the IEP team at district's expense as long as Student's behavior plan require is.

d.  Before June 30 2024, Student's IEP team shall meet to review the comprehensive evaluation, behavior analysis, and behavior plan/transition plan, and develop an IEP for the 2024-2025 school year with placement at a school other than Hunt Elementary.

## V.  CLAIM FOR RELIEF PURSUANT TO THE IDEA

40.  The District re-alleges and restates each of the allegations contained in the preceding paragraphs as if set forth fully herein.

41.  The Decision is not supported by evidence admitted during the hearing.

42.  Despite finding that expert testimony offered by Parents from Dr. Barnes regarding Student's needs in this case were "not well-founded" (Ex. B at pp. 13), the Hearing Officer somehow was still able to find that the District failed to provide Student a FAPE.

43.  The Decision ultimately states the opinions of the hearing officer regarding how the Student's reevaluation resulted in the development and implementation of inadequate IEPs thereafter. These opinions of the hearing officer were not presented at the Hearing, obviously, and they are unsupported by reliable evidence that was presented at the Hearing for the hearing officer's consideration.

44.     Furthermore, the Decision fails to identify ways in which the reevaluation led to the District's supposed failure to develop and implement IEPs reasonably calculated to enable Student's progress.

45.     Thus, the Decision's finding that the District failed to develop and implement appropriate IEPs, also is incorrect and is unsupported by the evidence in the record.

46.     Indeed, by focusing on the shortcomings of the reevaluation of Student's qualifying disability, the Decision fails address whether Student's IEPs developed after that change were reasonably calculated to enable Student to continue to make progress appropriate in light of her individual circumstances.

47.     Instead, the Order finds against the District for the identified issues with the reevaluation and presumes that this inherently results in an inadequate IEP and denial of FAPE.

48.     The Decision fails to apply the correct legal standard.

49.     These and other errors culminated in the Decision's award to Parent of relief to which she is not entitled and that is contrary to the preponderance of the evidence.

50.     Thus, the District is a "party aggrieved" by the Decision, and as such, the District brings this action for judicial review of the Decision pursuant to 20 U.S.C. § 1415(i)(2)(A).

WHEREFORE, Plaintiff, Springdale School District, respectfully requests that this Court reverse the Decision on all issues decided in favor of Parents, enter judgment in favor of the District, and award the District any other relief to which it may be entitled.

Respectfully submitted,

Marshall S. Ney, Ark. Bar No. 91108
Katherine C. Campbell, Ark. Bar No. 2013241
FRIDAY, ELDREDGE & CLARK, LLP
3350 S. Pinnacle Hills Parkway, Suite 301
Rogers, AR 72758
Office: (479) 695-6049
Facsimile: (501) 244-5389
mney@fridayfirm.com
kcampbell@fridayfirm.com

# EXHIBIT A

# IN THE ARKANSAS DEPARTMENT OF EDUCATION
## SPECIAL EDUCATION DIVISION



███████ AND §
███████████, §
Parents of ██████████, §
§
Parents/Student §        CASE NO.  H-24-_____
§
v. §
§
SPRINGDALE SCHOOL DISTRICT, §
§
District §

---

## DUE PROCESS COMPLAINT

---

Parents, ██████████ AND ████████████████, on behalf of their minor daughter, ██████████ and pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §1400, et seq., and the implementing Arkansas Department of Education Special Education and Related Services Rules ("ADE Spec. Ed. Rules") §10.01.7, file this Due Process Complaint and alleges  as follows:

## I. PARTIES

1. ████████████████ **AND** ████████████████████ ("Parents") are the Parents of ██████████████. They reside at ██████ ████████████████████████, where ██████ is enrolled in the Springdale School District. ("District")

2. ████████████████████, age 10 (DOB: ██████████████), is a Child With a Disability as such is defined in 20 U.S.C. §1401(3) who by reason thereof needs special education, related services, supplementary aids and services, supports, accommodations, and/or modifications as defined by the Individuals with Disabilities Education Act ("IDEA"). See 20 U.S.C. §1400(26), (29), (33). ██████ is a 5th Grade Student at J.B. Hunt Elementary in the District. ██████ has been diagnosed with Autism Spectrum Disorder - level 2; Profound Language Disorder; and Global Developmental Delays.

3. **SPRINGDALE SCHOOL DISTRICT** ("District") is a Local Education Agency ("LEA") as such is defined in 20 U.S.C. §1401(19). The District is obligated to provide the Student a Free Appropriate

Public Education and has failed to comply with the provisions set forth in Part B of the IDEA, Public Law 108-446, 34 C.F.R. Parts 300 and 301 (August 14, 2006) and the regulations implementing the Individuals With Disabilities improvement Act of 2004.

## II. INTRODUCTION

4.     Parents file this Due Process Complaint because ██████ - who is chiefly non-verbal - came home on October 6, 2023, with a massive amount of bruising all over her body which remains unexplained. Since that time ██████ continues to exhibit extreme adverse reactions when school is mentioned and refuses to go to school. An investigation triggered after the incident led the Parents to conclude that the District has not only been neglectful, but has failed to provide ██████ appropriate services and supports for her to make progress and benefit educationally.

## III. FACTS

5.     ██████ was referred for a comprehensive evaluation at age 3 by her primary care physician due to concerns with developmental

delays and more specifically, speech/language delays. **PR-124**

6.      Comprehensive psychological testing administered by the Parent's private provider on 7/11/2016 showed ███ with an IQ cognitive composite score of 75 and a percentile rank of 5. Testing further showed ███ skills in receptive and expressive language; adaptive behavior, daily living, and fine and gross motor were all significantly delayed. **PR-129-130**

7.      An Autism Diagnostic Observation Schedule-Second Edition (ADOS-2), CARS2, Child Behavior Checklists, and Caregiver-Teacher Report Forms were all administered. ███ was given the following diagnoses: Autism Spectrum Disorder, Level II, with accompanying language and cognitive impairment, non verbal; Global Developmental Delay; and Language Disorder, Profound. **PR-135**

8.      As a result of the evaluation and recommendations, ███ was able to receive ABA therapy and other developmental services at home or in a clinic setting. **PR-136**

9.      ███ began Kindergarten (2018-2019) and First grade

(2019-2020) as a virtual student enrolled in the Arkansas Virtual Academy, as her Mother was reluctant to send her to school due to her lack of language and communication skills. Instead, ███ received ST, OT & PT from private providers while her Parent assisted in the virtual instruction.

## 2nd Grade 2020-2021

10.    Following COVID, ███ transferred into the District beginning in the 2020-2021 year as a 2nd grade virtual student.

11.    The 2nd Grade IEP lists the latest testing was done on 10/25/18 - while ███ was a virtual Student at Arkansas Virtual Academy. **DR-160**

12.    ███ was placed first as a virtual Student at the Don Tyson Virtual Innovation Academy - where she was placed on an IEP and received limited special education instruction on a virtual platform under the category of Autism.

13.    Notations contained on ███ IEP indicate that she made little to no progress during the 2nd grade year.

14.     During the 2021-2022 school year, ███ began attending in-person instruction where she was placed in the self-contained classroom at Hunt Elementary around December, 2021. **PR-86**.

15.     The District conducted testing on 10/21/2021 prior to ███ starting in person.  ADE Regulations require the following testing be administered to identify a student under the Autism category:

    a.     Social History (Emphasis on developmental history)

    b.     Individual Intelligence (One required)

    c.     Individual Achievement (One required)

    d.     Adaptive Behavior (One required)

    e.     Communicative Abilities (Both receptive and expressive required)

    f.     Observation (Required) Observation should cover personal-social behaviors, toy play, conversational speech, emotional expression, amount of time spent in idiosyncratic repetitive

behaviors and eating behavior. Information can be obtained in a variety of settings including observing the child in the home environment, classroom and play situations. The observed behaviors should be viewed in terms of developmental age so that formal assessment data and observational data can be compared. Observational data must be considered part of the educational evaluation due to the impact of behavior upon skill acquisition.

g.    Medical (Required) -

    i.    Physical examination

    ii.    Specialized, if indicated

16.    Despite the ADE's required battery of testing - the only testing done by the District was in the category of Adaptive Behavior - and although a Parent Form is available on the ABAS-3 - no information was gathered from the Parent. The Developmental Profile 4 (DP-4) - typically used in a pre-school environment measures development across five scales: *Physical, Adaptive Behavior, Social-Emotional,*

*Cognitive, and Communication.* The test takes 20-40 minutes and consists of a simple, yes-or-no format of 190 test items, each describing a particular skill. The District used ▮▮▮▮ virtual teacher *from the prior school (2020-21) year* as the sole reporter on both the ABAS and DP-4.

17.    There is no indication that any face-to-face testing was attempted for ▮▮▮▮ - such as the C-TONI, and the results of the communication testing was not included in the District's evaluation.

18.    The only comprehensive testing performed on ▮▮▮▮ seems to be that done by a private provider, Schmieding Developmental Center, when she was 3 years and 2 months old. **PR-65**.

19.    The testing done while at the Virtual Academy at age 5 which is referenced but not contained in the District records. **DR-160**  The RAS-2 showing a composite IQ of 40 was done at age 5, and was listed on her IEPs until 4th grade.  This IQ score appears misleading and vastly different from the composite IQ score obtained when ▮▮▮▮ was 3 years old (75). Still, no IQ or achievement testing has

been attempted for ███ since her enrollment.

20.     *Neither has the District done any progress monitoring; achievement testing; Classroom Based Assessments; or any testing to provide any information to the Parent or the IEP Team concerning* ███ *Present Level of Academic Achievement and Functional Performance from which IEPs were developed.* Instead, the District seemed to indicate in its records that a Brigance or ABLLS was conducted just to indicate that something was being done. **DR-191; DR-214.**

21.     ███ was provided ABA therapy outside of her school day as part of the Waiver Program until aging out at 8 years old. Although the Parent requested ABA Therapy be included in ███ IEP, the District did not provide ABA therapy. Her IEP developed on 10/21/2021 with regard to related services states: "She receives speech, OT & PT private therapies. ███ will receive school-based speech services. ███ is on a waiting list to receive ABA services outside of school." **DR-45**

22.     Her IEP indicates testing done on 11/8/21 showed "███ is eligible to take the the alternative assessment. . . .[D]ue to her significant cognitive disability." **DR-44**  Again, this is misleading, as the District conducted no testing on ███ to substantiate a "significant cognitive disability." Her 3rd Grade IEP further states "███ is making a transitional move to a face-to-face instructional setting. She will begin with a shorten day and her progress will be reviewed every 90 days." **DR-45**.

23.     Since ███ began her attending in person she has only attended school for partial days, and her progress has never been reviewed. Specifically ███ attends school from 8:00 am - 3:10 pm Wednesday, Thursday, and Friday; and Monday and Tuesday from 12:30 pm to 3:00 pm.  The reason ███ attends school part-time is because she requires private Speech/Language and Occupational Therapy to obtain the appropriate amounts of ST and OT services she requires as the District only provides 15-20 minutes per week of ST and OT.

24.    No OT or ST testing of any type was been performed by the District since ███ began attending classes in 3rd grade and no reports on the little amount of ST or OT ███ does receive at school has been provided to the Parent. DR-89

### 4th Grade - 2022-2023

25.    ███ 4th Grade IEP contains Reading goals that specify the use of the "Edmark Reading Program." **DR-8** The Edmar Reading Program focuses on whole words and ***is not on the ADE's approved core curriculum Reading*** list. Instead of using letter-sound connections, which is what structured literacy programs such as Phonics First emphasizes, **Edmark** focuses on recognizing words and comprehending texts from pictures. Despite *Phonics First* being used by all K-3 students enrolled in the District - ███ is provided an inferior program that fails to include the principles in the Science of Reading as required by State law.

26.    ███ Parents were given little to no information concerning her progress - and specifically, not given any Report Cards, not given

any classroom work, and not given any periodic progress on the goals and objective contained on ███ IEPs. The only information provided to the Parents came from verbal information provided twice a year at Parent Teacher Conferences.

27.    Although ███ was non verbal the District's sole attempt to address this issue was to issue her an iPad containing the "LAMP" app on 10/20/22 and set up an online session for the Parent to learn the basics of the Program.

28.    Although ███ was issued an AAC device while at the Virtual Academy, the goals she had at age 5 were similar to the goals she has now on her 4th & 5th grade IEPs and none of her teachers or peers have been trained to communicate with her on the device. Consequently, ███ does not use the device as her voice to communicate.

## 5th Grade 2023-2024

29.    ███ began 5th grade with an IEP which contains goals and objectives identical to the ones contained on her 4th grade IEP.

30.    █████ behavior has been easily managed without a formal Behavior Intervention Plan being developed, and no aggressive behaviors have been documented.

31.    █████ most recent behaviors observed by her Speech Therapist were listed as "Active and Energetic; Avoidance Behaviors, i.e.looking away, refusing activity, etc.; Decreased Attention; Difficulty Attending to test stimuli; and Difficulty Transitioning from sensory play." **PR-47**

32.    Although the Parents use language with █████ at home - who is able to speak some words - the classroom teacher apparently uses "picture behavior cue cards to show the children in the class what we want them to do."

33.    Around September 15, 2023, █████ began to develop an obsession for "Hunt Elementary School Shirts" that were on sale at the school and displayed for █████ to see when she walked by the school office.

34.    On the afternoon of October 5, 2023, when ▓▓▓ mother picked her up from school, she began having a tantrum as they walked by the school office because she wanted her mother to buy the shirt then.

   a.    The Parent sent ▓▓▓ teacher a text and asked permission to go ahead and buy the shirt for ▓▓ - noting her tantrum. The teacher asked the Parent to "*wait until* ▓▓ *was in the classroom to buy the shirt so she did not think she was giving in to her because she had a tantrum.*" The Parent agreed to wait to buy the shirt until she picked ▓▓ up on the afternoon of October 6.

35.    On October 6, when ▓▓▓ Mother came to pick her up ▓▓▓ teacher reported that "▓▓ had a bad day and may have some bruising on the front of her legs caused by sitting in a chair and bumping her legs against a table."

36.    When Parent examined ▓▓ she found bruising on ▓▓▓ stomach, front, the back of her legs, and on her arms. The Parent counted more than 20 bruises on ▓▓ body.

37.    Parent took ███ to the emergency room for further

examination and an opinion on what could cause these types of

injuries. The injuries were not consistent with the teacher's report.

38.    The Parent also filed a police report and a report with child

protective services dealing with ███ intense feelings or distress.

39.    The Parent's actions described above were free speech

protected activities, as the Parent was advocating for ███ civil

rights under federal and state law for which the District has

retaliated.

40.    Since October 6, the Parent has been unable to get ███ to

return to school, as ███ engages in self-harm behaviors, including

elopement, whenever school is mentioned.

41.    Rather than scheduling an IEP meeting to review and revise the

IEP in light of the events of October 6 and to consider providing

homebound services until ███ could safely return to school, the

District threatened to file a Family in Need of Services ("FINS")

petition against Parent.

42.   Under Arkansas law, a "Family in needs of services" means:

Any family whose juvenile evidences behavior that includes, but is not limited to, the following:

(A) Being habitually and without justification absent from school while subject to compulsory school attendance.

(B) Being habitually disobedient to the reasonable and lawful commands of his or her parent, guardian, or custodian; or

(C) Having absented himself or herself from the juvenile's home without sufficient cause, permission, or justification;

Ark. Code Ann. § 9-27-303(23).

43.   Once the Parent retained Counsel, Parent's Counsel notified the District's Staff Attorney of her representation and requested records, at which time all harassment stopped. No IEP Meeting has been held prior to this date to allow Counsel to review Student records - so that a decision could be made and the Parent could be advised of her rights and options.

44.   Parent submits that the trauma inflicted upon ▮▮▮ by or because of the District and ▮▮▮ resulting self-harm behaviors justify her absence from school. ▮▮▮ cannot safely return to school

at this time because she may elope or otherwise harm herself and others.

45.     Because ███ cannot communicate what happened to her, Parent must interpret the message being sent by ███ self-harming behaviors. For Parent, the message is clear: ███ is terrified of returning to school and may do anything to avoid returning to school.

46.     *At best, it appears that* ███ *was allowed to hit, kick and engage in other various self-harm behaviors and cry the entire time she was at school on October 6, 2023, while her teacher and other staff whom she directed wholly ignored* ███ *- which might explain the dozens of bruises all over her body.*

47.     Parents file this Due Process Complaint because ███ has been denied any meaningful educational benefit since October 21, 2021, through and until this date; has denied her a FAPE; and by the trauma of October 6, has been further harmed so that the Parents have concluded that this District is either unwilling and/or unable to

provide ▮ a Free Appropriate Public Education.

48.　Accordingly, the Parent gives the District Notice pursuant to 20 USC § 1412(a)(10)(C) that they reject ▮ continued placement at Hunt Elementary Schoo; deny that her current IEP provides her a Free Appropriate Public Education due to the reasons and failures of services and supports set forth herein; and that they intend to pursue enrollment of ▮ in a private school at public expense.

49.　On October 18, 2023, the District held an IEP team meeting to conduct its annual review of ▮ IEP.　The Parent was too scared to attend because of the District's retaliation described above.

50.　Without Parent present, the IEP team "moved forward with the annual review only to change the date on her IEP." **NOA, p. 1**. The IEP team reported, "When ▮ resumes her attendance, the team will come together, review progress, and develop new goals." *Id.* In sum, the District did nothing and blamed the Parent. However, Parent not attending does not excuse the District's failure to comply with the IDEA. *See Anchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1055

(9th Cir.2012) ("[P]articipating educational agencies cannot excuse their failure to satisfy the IDEA's procedural requirements by blaming the parents."); *see also W.G. v. Bd. of Trs. of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1485 (9th Cir. 1992) (holding that the school district could not blame parents' choice to leave an IEP meeting for its own failure to create an IEP with the participation of the appropriate parties).

51.    Until private school placement is in place, the Parent will meet with the District at her earliest opportunity to change ▮▮▮ IEP, so that ▮▮▮ can receive appropriate instruction in addition to her private therapies and until her private school placement can be accomplished.

## IV.   ISSUES PRESENTED[1]

1)  Whether the District denied ▮▮▮ a FAPE during the 2021-2022; 2022-2023; and 2023-2024 school years; and whether the IEP for the 2023-2024 school year is necessary and appropriate?

---

[1] *See M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1196 n.2 (9th Cir. 2017) ("A party bringing a due process complaint is entitled to frame the issues it wishes to present . . . .").

2) Whether the District should be ordered to pay for ███ placement at a private school?

## Other Federal Claims

Parent alleges that the District's conduct described herein also constitutes disability discrimination in violation of §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §12131-12165; and First Amendment retaliation in violation of the First and Fifth Amendments to the U.S. Constitution enforceable via 42 U.S.C. §1983. A due process hearing officer in Arkansas has no jurisdiction over these other federal claims. *See* ADE Spec. Ed. Rules §10.01.22.1. Accordingly, Parent's other federal claims should be dismissed *without prejudice*, and Parent should be found to have exhausted their administrative remedies as required by 20 U.S.C. §1415(l).

## V.  APPROPRIATE RELIEF

Parents respectfully request that the District be ordered to:

1.   Pay all tuition, fees, and costs, associated with ███

placement at a private school for the remainder of the 2023-2024

school year;

2.   Pay all tuition, fees, and costs of ███ enrollment and

attendance each successive school year until such time as the District

offers ███ an IEP that it can implement and that will provide her a

FAPE in the least-restrictive environment; and,

3.   Provide Parents and all other just and proper relief to which

they are entitled.

Respectfully Submitted,

**Caldwell Law Office**
14 Alban Lane
Little Rock, Arkansas 72223
Phone (501) 414-0434
Fax: (501) 325-1502

/s/ Theresa L. Caldwell
Theresa L. Caldwell (Bar #91163)
Email: theresa@specedattorney.com

Attorney for Parents

<u>**CERTIFICATE OF SERVICE**</u>

This will certify that a copy of the above and foregoing instrument was served upon the ADE and District via email to their representative listed below on this 9th day of November, 2023.

Mr. Rick Porter
Administrator, Dispute Resolution and Special Projects
Arkansas Department of Education
Division of Elementary and Secondary Education
Fax: 501-683-4496
Email: rick.porter@ade.arkansas.gov
Email: brenda.watson@ade.arkansas.gov

Mr. Jared Cleveland
District Superintendent
Fax: 479-750-8814
Email: jcleveland@sdale.org

Ms. Kendra Clay
District General Counsel
Email: kclay@sdale.org

/s/ Theresa L. Caldwell
Theresa L. Caldwell

# EXHIBIT B



**AND** ▮
▮ **, as Parents of** ▮
**Petitioners/Parents**

**VS.**                                                                 **NO. H-24-21**

**SPRINGDALE SCHOOL DISTRICT,**
**Respondent/District**

## HEARING OFFICER'S FINAL DECISION AND ORDER

▮ ("Student") is a child with a learning disability who is eligible for

special education services from the Springdale School District ("District"). On November 9,

2023, Student's parents ▮ and ▮ ("Parents" or, if mother,

"Parent"), filed a request for a due process hearing pursuant to the Individuals with Disabilities

in Education Act, 20 U.S.C. § 1400 et seq. ("IDEA") alleging that District failed to comply with

the IDEA, its implementing regulations, and regulations of the Arkansas Department of

Education, Special Education Division ("Department"), thereby denying Student a free and

appropriate education (FAPE) under the IDEA. As discussed later in this Order, it is found that

District failed to develop and implement appropriate IEPs for Student's third, fourth, and fifth

grade years, as well as violating the IDEA's requirement of placing Student in the least

restrictive environment (LRE), thus denying Student a FAPE. Accordingly, relief is granted to

Parents as discussed more fully below in the form of a comprehensive evaluation, a functional

behavioral evaluation to address trauma-induced behavior and inform the development of a

behavior plan, and the development of an appropriate IEP, to include assignment to a different

school.

# I.
## ISSUES PRESENTED

A.    Whether District denied Student a FAPE in violation of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C. §§ 1400-1485, as amended ("IDEA") from November 9, 2021, through November 9, 2023, by failing to develop and implement appropriate Individualized Education Programs (IEPs) for Student for the third, fourth, and fifth grades;

B.    Whether District denied Student a FAPE when it placed Student in a self-contained classroom without making an appropriate determination of least restrictive environment; and

C.    Whether District should be required to pay for Student to attend a private school.

# II.
## NON-JUSTICIABLE ISSUES

Parents also allege that District's conduct constitutes disability discrimination in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12165. Parent also asserts retaliation based on the disability discrimination claims as well as retaliation for the exercise of Student's free speech rights under the First and Fifth Amendments to the U.S. Constitution. This Hearing Officer has no jurisdiction over disability discrimination claims or violations of freedom of speech. *See* Ark. Dept. of Ed., Spec. Ed. Rules §10.01.22.1. Accordingly, to the extent Parents' due process complaint raises disability discrimination claims and violations of freedom of speech, those claims are DISMISSED without prejudice.

# III.
## PROCEDURAL HISTORY

On November 9, 2023, the Department received from Parents, a request to initiate due process hearing procedures. *See* Due Process Complaint.

In response to the Parents' request for a due process hearing, the Department assigned the case to an impartial hearing officer. The timeline was extended for good cause on December 21, 2023, and the hearing was scheduled for four (4) days to begin on February 13, 2024. On February 12, 2024, a pre-hearing conference was held to hear Parents' Notice of Due Process Violations and Motion for Expedited Relief. As a result of that conference, an Order was entered that excluded certain of District's documents, specifically those numbered 22-44 on District's Pre-Trial Disclosure list. However, at the hearing, Parents withdrew the request to exclude and those documents were admitted into evidence. Tr. Vol. II, p. 16.

Having been given jurisdiction and authority to conduct the hearing pursuant to the IDEA, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Cheryl L. Reinhart, J.D., Hearing Officer for the Department, conducted a closed impartial hearing. Parties present for the hearing were ▮▮▮▮ and ▮▮▮▮▮▮ ("Parents"), represented by Theresa L. Caldwell, Caldwell Law Office, Little Rock, Arkansas, and Andrea Ingram ("Ingram"), the District's Director of Special Education, represented by Marshall S. Ney of Friday, Eldredge & Clark, LLP, Little Rock, Arkansas. Perla J. Alarcon-Flory was also present and served as an interpreter for Parents throughout the hearing.

Testimony was heard on February 13, 14, 15, and 16, 2024. *See* Transcript, generally, Vols. I-IV. In addition to Parent and Ingram, the following witnesses testified in this matter: Wanda Proctor, special education teacher at Hunt Elementary School; Patti Athey, Assistant Principal, Hunt Elementary School; Dr. Robin Marsh, school psychologist for District; and Dr. Sheila Barnes, school psychologist and Board Certified Behavior Analyst, expert witness for Parents. Audra Alumbaugh and Dr. Chris Carr were present as consultants for the Parents.

## IV.  FINDINGS OF FACT

Student is a female who, at the time the due process complaint in this case was filed, was 10 years of age, in the fifth grade, and enrolled in the Springdale School District at Hunt Elementary School. Complaint, p. 1; Response, p. 1.

### (a) Early Evaluations and Diagnoses

At age three, Student underwent a psychological evaluation by the UAMS Schmieding Development Center and was diagnosed with Autism Spectrum Disorder (Level 2), Profound Language Disorder, and Global Developmental Delays, and identified as having an IQ of 40. See *UAMS Schmieding Development Center Psychological Evaluation*, July 11, 2016, Parent Exh. pp. 258-272. Wendy Lynch, Arkansas Virtual Academy, conducted another psychological evaluation of Student on October 19, 2018, reporting her cognitive abilities and achievement scores were "well below average range," "at-risk" in functional communication skills and activities of daily living, as well as concurring with her diagnosis of autism. Parent Exh. pp. 471-476. Student also received applied behavior analysis (ABA) services, and private speech, physical, and occupational therapies. Tr. Vol. IV, pp. 124.

### (b) IEP Background Prior to Third Grade

**The statutory timeline for this due process complaint begins November 9, 2021, a few months into Student's third-grade year, but findings of fact for the period before that date are provided for background and context.**

Student came to the District having been home-schooled with private therapies. Tr. Vol. III, pp. 126-127. She first enrolled in the District in her second-grade year on October 2, 2020 (during the COVID pandemic), as a homebound special education student at the Don Tyson School of Innovation ("DTSOI" also referenced as "Virtual Innovation Academy" or "VIA"),

District's charter school and virtual academy. Parent Exh. pp. 169-170. The Transfer Review Form indicates a "previous eligibility date" of 10/25/2018, along with a summary of existing data reviewed. Parent Exh. pp. 169-170. District developed an IEP on October 30, 2020[1] (Parent Exh. pp. 231-247), and amended the IEP on February 26, 2021 (Parent Exh. pp.192-210), and April 16, 2021 (Parent Exh. pp. 173-191).

### (c) 2021-2022 School Year - Third Grade

Student began the third grade enrolled at the DTSOI. DTSOI amended her IEP on 9/20/21. Parent Exh. pp, 168A-Q. Student's 9/20/21 IEP Progress Report contained no information about Student's progress on objectives and all of her goals were continued. Parent Exh. pp. 318-322. When Student's siblings "automatically" went back to school at Smith Elementary after COVID, Parent contacted Smith Elementary about Student attending school, and was told to call Hunt Elementary. Tr. Vol. III, p. 139. Parent did not know why, other than guessing it was because the school knew her and her children, and had seen Student. Tr. Vol. III, p. 139.

### i.  10/18/21 Reevaluation

For the transition to face-to-face instruction, District conducted a "reevaluation," and on October 18, 2021, Dr. Robin Marsh issued her "Confidential Psychoeducational Report – Reevaluation." Parent Exh. pp. 252-257. The report relied heavily on existing data from the 2016

---

[1] Both the IEP and Notice of Action (Parent Exh. pp. 167-168) reflect Bayyari Elementary School, but District witnesses stated that it was a "mistake."[1] Tr. Vol. II, p. 106; Tr. Vol. IV, pp. 101-102. Throughout the hearing, a number of mistakes on IEPs and evaluations were noted: objective #5 is same as the annual goal, Parent Exh. p. 33, Tr. Vol. I, p. 128; duplicate objective on IEP, Parent Exh. p. 33, Tr. Vol. I, p. 129; zero percent of general education setting noted on IEP, Parent Exh. p. 156, Tr. Vol. II, p. 71; Student can take the regular statewide assessments, Parent Exh. p. 143, Tr. Vol. II, pl 119; Student's date of birth and age incorrect on reevaluation report, Parent Exh. p. 252; dates shown for the three assessment tools are incorrect on reevaluation report, Parent Exh. p. 253; Tr. Vol. II, p. 199.

Schmeiding evaluation (age 3) (*Id.* at p. 252), 2018 data (age 5) – including social history, vision/hearing screening, observations from 2018, and assessments for intelligence, achievement, adaptive behavior from 2018. (*Id.* at pp. 252-253). The most current assessment data was obtained from the Developmental Profile 4 (DP-4) administered by her second-grade virtual special education teacher, Mr. Peavy (*Id.* at p. 253), and the Adaptive Behavior Assessment System (ABAS-3) (*Id.* at p. 253), also administered by Peavy. Marsh noted in her report that Peavy's information should be "considered with caution" as he admitted to "guessing" on some items assessed. (*Id.* at p. 256). The report states that Glendy Reed, Student's private Speech/Language Pathologist, had "recently" conducted a speech/language review (that is not in evidence), which Dr. Marsh accepted for the reevaluation. *Id.* at p. 257. Dr. Marsh did not personally observe Student, did not interview her, and did not conduct any assessments. Tr. Vol. IV, pp. 77-78.

The results of the reevaluation assessments were as follows:

- On the DP-4, Student scored "a standard score of 40 in all areas evaluated and on the General Development Score … percentile rank of <1, and the Descriptive Range was in the Very Delayed area."
- The results of the ABAS-3 were all in the Extremely Low Adaptive Level. Parent Exh. pp. 253-254.

Dr. Marsh concluded that the reevaluation supports the classification of autism and continued related services in speech. Parent Exh. p. 257. She recommended an occupational therapy referral for screening. *Id.* Following the reevaluation, an IEP was developed dated 10/21/21 to 10/20/22, which as amended on 11/12/21 and 3/4/22.

## ii. 10/21/21 to 10/20/22 IEP

On 10/21/21, based on the reevaluation, the District IEP team developed an IEP and enrolled Student in a self-contained classroom at Hunt Elementary School. Parent Exh. pp. 146-160. The self-contained classroom is staffed with one adult for 10 children, kindergarten to fifth grade. All students in the class are disabled, most are autistic. Staffing includes: one special education teacher, Wanda Proctor, and three paraprofessionals (who are currently all substitutes). Tr. Vol. I, pp. 42-44.

On the 10/21/21 IEP, Student's Present Level of Academic Achievement and Functional Performance is essentially the same as the second-grade IEP (Parent Exh. pp. 147-148), but it references an update from a 9/20/2021 speech evaluation conducted by the Children's Therapy T.E.A.M. (which is not in evidence). The IEP identified five (5) goals for Student in the areas of English Language Arts (2 goals), Mathematics, Speech/Language, and Behavior, and included direct instruction minutes for a reduced day in the amount of 750 minutes per week, 100% in a self-contained classroom. Parent Exh. pp. 151-157. Student also uses a LAMP device to assist with communication, which she began using in 2019, and "receives text-to-speech, visuals, edible reinforcements, and classroom recordable devices for learning." Parent Exh. p. 147; Tr. Vol. IV, pp. 23-24.

Student was placed at Hunt Elementary School, in a self-contained classroom, instead of at Smith Elementary School, which is Student's assigned "home" school, and where some of her siblings attend. Tr. Vol. III, pp. 138-141. Parent only understood that Student was placed at Hunt because of her disability, and she was concerned that Hunt was not close to her home. Tr. Vol. III, p. 140. Hunt Elementary Principal Athey, a member of Student's IEP team (Tr. Vol. II, p. 40), testified that the former Special Education Supervisor at that time would have made the

decision to place Student at Hunt, not the IEP team. *Id.* at 81. Hunt has a self-contained classroom, and Smith does not. *Id.* Athey testified that at the direction of "someone from the Special Education Department," she gave Parent a tour of the school and the self-contained classroom. Tr. Vol. II, p. 82. When asked why a closer school with a self-contained classroom was not chosen, Athey responded, "I don't know." Tr. Vol. II, p. 113.

Student attended on a reduced schedule for a short time. Twice a week, Student received private speech, physical, and occupational therapies, and arrived at school at approximately noon and stayed to the end of the school day. The remaining three days she arrived at 7:45 a.m. Tr. Vol. I, pp. 30-32. The self-contained classroom daily schedule included: work on functional routines (eating, toileting) (.5 hour), educational activity "free" time (.25 hour), small group or one-to-one time (math, reading, writing) (2 hours). Tr. Vol. I, pp. 40-42. Lunch and recess followed, with class resuming at 1:30 for .5 hour, and then Student left the classroom for her "specials" (instruction in physical education, music, art, and library) until 3:00. Tr. Vol. I, pp. 35-40. Functional routines follow until departure. Tr. Vol. I, p. 39.

### iii. 11/12/21 Amended IEP

**(First IEP developed after the due process timeline began on November 9, 2021)**

The IEP team amended Student's IEP on 11/12/21 to reflect that Student is eligible to take the alternate assessment. Parent Exh. p. 131. Hunt Elementary Principal, Athey, testified that the IEP team decided the alternate assessment was appropriate because Student "had an IQ of 40." Tr. Vol. II, pp. 60-61.

iv. 3/4/22 Amended IEP

The IEP team amended Student's IEP again on 3/4/22. Student's 3/4/22 IEP Progress Report indicated that all five of Student's goals were continued, indicating "no progress" on 5/22 objectives listed, "continued" on 7/22 objectives, and "mastered" on 10/22 objectives. Parent Exh. pp. 323-322. The amended IEP reflects only that Student will receive end-of-school-year (ESY) services as direct instruction in the areas of reading, writing, math, behavior, and speech, for 45 minutes five times per week. Parent Exh. pp. 108-109.

Student's Attendance report for the 2021-2022 school year show 28 days attended and 54 absences, consisting of 5 medical, 18 quarantined, and 27 unexcused. Parent Exh. pp. 309-310. Parent also testified that she did not take Student to school for the ESY services, because they were offered at a school other than Hunt where Student would not be comfortable around new people. Tr. Vol. III, p. 149.

### (d) 2022-2023 School Year - Fourth Grade

Student's 10/18/2022 to 10/17/2023 IEP, indicates that Student attended the fourth grade at Hunt Elementary in the self-contained classroom. Parent Exh. 80-98. The IEP was amended 1/12/2023 after reviewing and accepting OT and PT evaluations. Parent Exh. pp. 58-77. The IEP team amended Student's IEP again on 5/19/2023 (Parent Exh. pp. 28-55), which reflects that Student will receive end-of-school-year (ESY) services as direct instruction in the areas of reading, writing, math, behavior, and speech, for 45 minutes five times per week. Parent Exh. pp. 108-109.

Student's 5/19/23 IEP Progress Report indicated that all seven of Student's goals were continued, and showed that she had made no progress on 7/33 objectives listed, 8/33 objectives were continued, and 18/33 objectives were mastered. Parent Exh. pp. 333-346.

Student's attendance report for the 2022-2023 school year shows 27 days attended and 49 absences, consisting of 6 medical, 38 unexcused, and 5 tardy or early-check out. Parent Exh. pp. 311-312. Parent did not take Student to school for the ESY services. Tr. Vol. III, p. 149.

Student was reevaluated for private occupational therapy on 6/13/2023. Parent Exh. pp. 295-303.

### (e) 2023-2024 School Year - Fifth Grade

Student began the fifth grade at Hunt Elementary, still in the self-contained classroom. *See* 10/16/2023 to 10/14/2024 IEP, Parent Exh. pp. 1-21. On 9/25/2023, Student was reevaluated for private speech therapy. Parent Exh. pp. 273-285. Parent had placed Student on a waiting list to receive ABA therapies, even though she had "aged out," and hoped to replace the private speech, physical, and occupational therapies with therapies at school. Tr. Vol. 2, pp. 34-35.

Student received reading instruction using the Edmark Program as a supplement to Phonics First. Tr. Vol. I, pp. 47-48. Student continues to use a LAMP device, and brings a personal iPad to school. Tr. Vol. I, pp. 133-136. It is not clear how much time she spends in the general education setting, or in class with non-disabled students, but attends her "specials." Tr. Vol. I, p. 145. Proctor's self-contained class also shared part of lunch time with the general education fifth grade class (*Id.*), but it was not clear from the testimony how much actual contact there was between the nondisabled students and the self-contained students. Student is assessed on an alternate assessment, the ABLLS, that is used for autistic students and administered by her teacher. Tr. Vol. I, p. 49.

Proctor testified that the school began dealing with some behavior issues in fifth grade, and had planned to address those at the next IEP meeting. Tr. Vol. I, p. 79. That meeting did not occur because Parent refused to attend. Tr. Vol. I, pp. 82-83.

Proctor testified that Student was making "really good progress," was starting to blend and decode words, was reading short phrases, matching a short phrase to a picture, and using tens frames in math. Tr. Vol. I, p. 23. Progress was reported to Parent, not on standard report cards, but at IEP meetings, and in the IEP documents. Tr. Vol. I, pp. 70-71. Despite her statement about Student making good progress, Proctor testified that Student's academic level in her fifth-grade year was still kindergarten to first grade. Tr. Vol. I, p. 49.

### (f) Events at School on October 6, 2023

Student has not attended school since October 6, 2023, due to events on that day that Parents allege "left [her] physically bruised and psychologically traumatized." Parent Post-Hearing Brief, p. (citing to Parent Exh. pp. 383 (doctor note) and Parent Exh. pp. 404-413 (photos of bruising)). Proctor testified that on October 5, 2023, Student became agitated about wanting a school t-shirt, and slapped at her peers, and at the school nurse – behavior that is unusual for Student. In a written statement, the Hunt Elementary school nurse, Tina Huddleston, stated that on October 5, Student cried most of the afternoon, screamed, repeatedly hit herself with her fists, kicked off her shoes and kicked herself on her legs and feet. Parent Exh. p. 370. Her agitation continued the next morning, October 6, 2023, with flailing her arms and crying about the shirt and the use of her personal iPad. Student later escalated to stomping, hitting her hands on the table, climbing up on a table, kicking her legs over a shelf next to the table, and intentionally hitting her head on the bulletin board behind her. Tr. Vol. I, pp. 86-89; Parent Exh. pp. 372-373. This behavior continued most of the day, and staff were only able to calm her a few

times. Tr. Vol. I, p. 87. An aide reported to Proctor that she saw bruising on Student's upper thigh. Tr. Vol. I, pp. 96-97. Proctor advised Parent of the "tantrum" and the possibility of more bruising. Parent Exh. p. 373; Tr. Vol. I, pp. 90-92.

After finding more than 30 bruises on Student's body that evening, Parent emailed the school on the following Monday, demanding an investigation, and stating that Student would not return to school until an investigation was completed. Parent Exh. p. 384-385. In an email dated October 17, 2023, District counsel, Kendra Clay, reported to Parent that the Springdale Police Department conducted an investigation into the report concerning Student's bruising and closed the file without a finding of wrongdoing." Parent Exh. p. 384.

Student immediately began manifesting an aversion to returning to school, and was seen by Dr. Susan Sullivan, Arkansas Children's Hospital, on October 19, 2023. Dr. Sullivan's note to District recommended "alternative schooling options," stating that Student was "exhibiting self-harm behaviors anytime school is mentioned ... [which are] increasingly more severe, and now include elopement." Parent Exh. p. 251, 283 (doctor's note).

Parent provided testimony from Dr. Sheila Barnes, as an expert witness. Tr. Vol. IV, p. 172. *See* Barnes Curriculum Vitae, Parent Exh. pp. 414-438. Dr. Barnes was a former special education teacher, who holds licenses as a reading specialist, a district administrator, and for the majority (20 years) of her career, a university professor. Dr. Barnes holds a second Master's degree in counseling psychology, and a doctorate in educational psychology. Tr. Vol. IV, p. 56. Dr. Barnes is a Board Certified Behavior Analyst (BCBA) and started Hope 4 Autism in 2012, "a clinic that provides home-based and clinic-based services, as well as support in the schools, to children with autism." Tr. Vol. IV, pp. 58-61. Barnes described Student's day-long crying escalating behaviors on October 6 as Student's efforts to get the District staff to listen to her, but

instead of listening, staff was trying to redirect her. Tr. Vol. IV, pp. 122-123. Barnes discussed stimulus pairing, which occurs when a child experiences a stressing event, such as the one Student experienced on October 6, the environment containing the stimuli becomes a trigger for the child to have the same reaction. Tr. Vol. IV, pp. 122-123. Barnes opined that Student's aversion to school was a result of the school environment being paired with the stimuli that caused her trauma. Tr. Vol. IV, pp. 122-123. Dr. Barnes recommended that a BCBA evaluate Student's behavior and prepare a plan for transitioning her back to school, which would include "re-pairing" with positive reinforcements implemented by a Registered Behavior Technician (RBT) at a neutral school, to overcome Student's aversion to Hunt. Tr. Vol. IV, pp. 125-126. Dr. Barnes suggested that the Grace School, in Fayetteville, Arkansas, where Student is on a wait list, would be an appropriate neutral school, but in the interim she should be placed at a school other than Hunt. Tr. Vol. IV, pp. 128-129.

Dr. Barnes testified that she was professionally very familiar with the Grace School where Parents are seeking to place Student. Tr. Vol. IV, pp. 128-129. Grace School uses highly trained BCBAs, occupational therapists, physical therapists, and speech therapists in affiliation with the Children's Therapy T.E.A.M (which is the same Arkansas Children's Hospital team that provides Student's private therapies) Tr. Vol. IV, p. 129. Barnes testified that the school's curriculum consisted of behavior programming and academic programming that is based on the science of behavior and learning. Grace School is overseen by BCBAs, who are specially trained to address Student's behavioral issues about returning to school. Tr. Vol. IV, pp. 129-130.

While Dr. Barnes has the requisite background for offering an expert opinion in special education for autistic children, her testimony as to Student's specific needs in this case was not as well-founded. For example, Barnes opined that Student should have been placed in the general

education environment since kindergarten. Tr. Vol. IV, p. 131. Yet, she testified that she based her opinion on a day-before-the-hearing document review ("skimming") and did not observe Student except in video clips (*Id.* at p. 123), and did not interview anyone or visit the school. Tr. Vol. IV, pp. 150-155. On that basis, District would have this hearing officer completely disregard Dr. Barnes' testimony. District Post-Hearing Brief, p. 14. However, Dr. Marsh also lacked familiarity with Student, yet had sufficient time and opportunity to observe and assess Student. District places a good deal of credibility on her reevaluation. I do not discount all of Dr. Barnes' testimony, but will accord a greater weight to her knowledge concerning the Grace School and the behavior of autistic children in general and their needs for effective behavioral strategies.

### (g) IEP Annual Review 10/16/23

The annual review of Student's IEP was scheduled for October 9, 2023. As a result of the events of October 6, 2023, Parent did not attend. The conference was rescheduled for October 16, 2023, to which Parent responded that she would not attend and "requested no amendments be made without her participation." The IEP team held the conference "in order to solely change the dates on [Student's] IEP." Parent Exh. p. 1. Proctor testified that the IEP team "had IEP recommendations ready," but that they had "respected [Parent's] wishes" to make no changes. Tr. Vol. I, p. 29; Parent Exh. p. 1. Proctor confirmed that Student did not come back to school, and that no IEP services were provided at school or at home after October 6. Tr. Vol. I, pp. 24-26; Parent Exh. p. 26. The Notice of Action from the October 16, 2023, IEP meeting stated, "When [Student] resumes her attendance, the team will come together, review progress, and develop new goals." Parent Exh. p. 26.

On five different days from October 9, 2023, through November 6, 2023, District

attempted to contact Parents to schedule IEP meetings. District Exh. Tabs 19-20. In those

communications, District twice offered to move Student to a different school and offered to meet

to consider recommendations made in Dr. Sullivan's note. Tab 19. District sent the letter on

November 6, 2023, (Tab 20) stating that District had not heard from Parents since October 23,

2023. *See* Tr. Vol. IV, pp. 239-240. On November 9, 2023, Parents filed the due process

complaint.

## V.
## LAW AND DISCUSSION

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children

with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. §

300.300(a). In 1982, in *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, the U.S. Supreme Court

addressed the meaning of FAPE and set out a two-part analysis that must be made by courts and

hearing officers in determining whether a school district has failed to provide FAPE as required

by federal law. 458 U.S. 176, 206-07 (1982).

The first part of the analysis determines whether the district complied with IDEA

procedural requirements. Procedural inadequacies are violations if they (a) impede the child's

right to a FAPE; (b) significantly impede the parents' opportunity to participate in the decision-

making process regarding the provision of a FAPE to the parents' child; or (c) cause a

deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii).

In the second part of the *Rowley* analysis, a court or hearing officer must determine

whether the district met the IDEA's substantive requirements. A district must develop an IEP

that is "tailored to the unique needs of a particular child" (*Rowley*, 458 U.S., at 181, 102 S. Ct.

3034), and is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 197, L. Ed. 2d 335 (2017).

### (a) <u>Procedural Violations</u>

Parents argue that District failed to report Student's actual progress to Parent and that this is a procedural violation that denied Student her educational benefits and impeded Parents' opportunity for meaningful participation. Parents Post-Hearing Brief, p. 15. While the evidence supports the statement that District did not deliver actual report cards to Parent, Parent did attend IEP meetings at which Student's progress was discussed. Also, the IEPs contained progress data, although the validity of the goals and progress indicated are in dispute. Therefore, this hearing officer does not find a procedural violation in this case. Instead, the IEPs constitute substantive violations of the IDEA, as discussed below.

### (b) <u>Substantive Violations</u>

The IDEA requires every IEP to include: (1) a statement of a student's present levels of academic achievement and functional performance; (2) a description of how a student's disability affects his or her involvement and progress in the general education curriculum; (3) annual goals that are measurable, as well as a description as to how progress toward stated goals will be measured; and (4) a description of special education and related services to be provided to student. 20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).

Each IEP relies on the most recent evaluation – whether that is an initial evaluation or a reevaluation – to provide information upon which an IEP team can determine whether a child is a child with a disability and the child's educational needs. 20 U.S.C. § 1414(a)(1)(A) and (C). An

evaluation should "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent." 20 U.S.C. § 1414(b)(2)(A). Of historical significance to this case is the "reevaluation" conducted by Dr. Marsh for Student's transition during third grade. The reevaluation took place approximately three weeks before the statutory time period begins for this due process complaint; but as discussed later, all IEPs subsequently developed relied on that faulty evaluation.

A reevaluation may be conducted as a review of existing data (also known as an existing data review or EDR). 20 U.S.C. § 1414(c)(1). However, according to guidance issued by the Office of Special Education Policy (OSEP), when a district bases a reevaluation solely on an EDR, the reevaluation **"must be sufficiently comprehensive to determine whether the child continues to have a disability and [determine] the educational needs of the child."** OSEP Policy Guidance, OSEP QA 20-01, September 28, 2020 (citing 34 C.F.R. § 300.305(a) (emphasis added). Indeed, OSEP earlier indicated that an EDR is generally insufficient for a team to determine whether a child qualifies as a child with a disability and the nature and extent of the child's educational needs." *Letter to Copenhaver*, 108 LRP 16368 (OSEP 2007). District has used EDR as the rule, rather than the exception, throughout Student's enrollment at the District.

The Department provides additional guidance for evaluating autistic students. It identifies six areas that an evaluation for identifying autism should include: (1) social history (emphasis on developmental history); (2) individual intelligence (one required); (3) individual achievement (one required); (4) adaptive behavior (one required); (5) communicative abilities (both receptive and expressive required); and (6) observation. *Ark. Dept. of Ed., Eligibility Criteria and Program*

*Guidelines for Children with Disabilities, Ages 3-21, Part I, Autism.*[2] Dr. Marsh's reevaluation report used existing evaluation data that was 3-5 years old and a wholly unreliable (by her own admission) DP-4 assessment completed by the virtual teacher. The reevaluation did not include a current social history, or assessments of intelligence or achievement.

Dr. Marsh did not personally observe Student for the reevaluation, even though she acknowledges that Student had a known diagnosis of autism. The Department guidance states that observation of an autistic student is a critical part of an evaluation and should be made as follows:

> Observation should cover personal-social behaviors, toy play, conversational speech, emotional expression, amount of time spent in idiosyncratic repetitive behaviors and eating behavior. Information can be obtained in a variety of settings including observing the child in the home environment, classroom and play situations. The observed behaviors should be viewed in terms of developmental age so that formal assessment data and observational data can be compared. **Observational data must be considered part of the educational evaluation due to the impact of behavior upon skill acquisition.** *Id.* (emphasis added)

Finally, the IDEA requires District to "ensure that assessments and other evaluation materials used to assess a child under Part 300 are … administered … in the form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is clearly not feasible to provide or administer." 34 CFR 300.304(c)(1)(ii); 20 U.S.C. 1414(b)(3)(A)(ii). Marsh's and the IEP team's review of existing data did not yield accurate information. In light of the difficulties of using standardized assessments to evaluate Student, personal observation would become even more important. Student had been either home-schooled or in virtual instruction for all of her education to that

---

[2] found at
https://arksped.ade.arkansas.gov/rules_regs_08/3.%20SPED%20ELIGIBILITY%20CRITERIA%20AND%20PRO
GRAM%20GUIDELINES%20FOR%20CHILDREN/PART%20I%20ELIGIBILITY%20CRITERIA%20AGES%2
05-21/A.%20AUTISM.pdf.

time (kindergarten virtual instruction, first grade home-schooled, Tr. Vol. III, p. 127; second grade homebound/virtual). Parent Exh. p. 173. Student had made little progress since kindergarten. These factors were important considerations for Dr. Marsh and the IEP team, and should have signaled the need for a comprehensive evaluation.

### i. Third- and Fourth-grade IEPs

For the reasons stated above, the 10/18/21 reevaluation was insufficient for the team to determine the nature and extent of Student's educational needs. The IEPs developed for third and fourth grade (2022 and 2023 school years) quoted heavily from the 2018 evaluation and the 10/18/21 reevaluation. Programming decisions were made for the third grade based on the IQ assessment of 40 made when Student was three years old. Her progress on goals was minimal. By the end of the fourth grade, she was still considered as being at a kindergarten to first grade level. Without an appropriate identification of Student's current educational needs, her third and fourth grade IEPs were not reasonably calculated to enable Student to make progress appropriate in light of her circumstances.

### ii. Fifth-grade IEP

Parent argues that District committed a substantive violation of the IDEA by adopting Student's fourth-grade IEP as the fifth-grade IEP without change. This hearing officer disagrees. Parent refused to meet, despite multiple attempts by the District to schedule an IEP meeting or to talk to Parents about moving Student to a different school. When a parent refuses to attend an IEP meeting, the district may conduct the meeting without the parent, but must "keep a record of its attempts to arrange a mutually agreed on time and place, such as (1) Detailed records of telephone calls made or attempted and the results of those calls; (2) Copies of correspondence

sent to the parents and any responses received; and (3) Detailed records of visits made to the parent's home or place of employment and the results of those visits." 300 C.F.R. § 300.322(d). District complied in this respect, and there is no denial of FAPE on the basis of the fifth-grade IEP.

### iii. Least Restrictive Environment (LRE)

A basic tenet of the IDEA is that a child with a disability should be educated "to the maximum extent appropriate" in the same environment as their nondisabled peers. 20 U.S.C. § 1412(a)(5)(A). The IDEA further mandates that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* The threshold question is whether the child can receive a FAPE in that least restrictive environment (LRE). *J.P. v. Belton Sch. Dist. No. 124*, 40 F.4th 887 (8th Cir. 2022). In *J.P*, where the student started in a more integrated setting and the district sought to move him to a more restrictive setting, the Eighth Circuit held that the ability of a student to receive a FAPE outweighed the benefit of maintaining a more integrated placement. *Id.* at 894.

In the present case, there was never an opportunity to observe Student in any environment other than the most restrictive one the District had to offer (short of homebound instruction). Parent argues that the District's special education administrator predetermined that Student should be assigned to a self-contained classroom at Hunt Elementary before the IEP team met. Parent Post-Hearing Brief, p. 8. In doing so, the IEP team acted on the administrator's directive rather than conducting its own assessment of what was the least restrictive environment for Student. It is the responsibility of the IEP team - including "the parents, and other persons

knowledgeable about the child" - to base the determination of LRE on the meaning of the evaluation data and the placement options under the IDEA. 34 C.F.R. § 300.116(a). Placement options begin with educating Student "in the school that [she] would attend if not disabled." 34 C.F.R. § 300.116(c). The placement should be (1) determined at least annually; (2) based on the child's IEP; and (3) as close as possible to the child's home. Smith Elementary was the school that Student would normally attend based on her residence, and where some of her siblings were enrolled. Smith offered special education services, but not a self-contained classroom, so Student was placed at Hunt. Parent also testified that Hunt was not close to their home.

District made the placement decision unilaterally, and the IEP team accepted the placement without properly evaluating Student, observing Student in any educational setting, or contemplating any other placement option than the pre-ordained self-contained classroom. I find that to be a denial of FAPE.

## VI. REMEDIES

Student is entitled to compensatory education and services to remedy any educational or other deficits that result from the denial of FAPE, and put Student in the position she would be absent a denial of FAPE. *Miener v. State of Missouri*, 800 F. 2d 749 (8th Cir.1986). Parent seeks the following remedies for the denial of a FAPE: (a) that District conduct a comprehensive evaluation of Student that includes the assessments set forth in the Department's Eligibility Criteria & Program Guidelines for children with Autism; (b) that Student's placement be changed to the Grace School at District's expense, to include transportation to and from school and extra-curricular and co-curricular activities; and (c) that District provide an interim placement for Student at a new school approved by the Parent, in the general education

classroom with appropriate supports, including a Registered Behavior Technician ("RBT") using Applied Behavioral Analysis ("ABA") techniques under the supervision of a BCBA.

### (a) <u>Comprehensive and Behavioral Evaluations</u>

As discussed above, a comprehensive evaluation of Student is needed to identify Student's educational needs, and to inform the IEP team for programming. A functional behavior assessment (FBA) is also needed to address Student's behavioral issues, inform a behavior plan, transition Student back to a neutral school environment. Therefore, District shall pay for an independent comprehensive evaluation of Student that complies with IDEA requirements and the Department's guidance for evaluations of autism. District shall pay for a BCBA of Parents' choosing to conduct a functional behavioral analysis and the development of a behavior plan for Student to include transition back to school, with the implementation of the plan by a trauma-trained RBT under the supervision of the BCBA. The BCBA shall be a member of Student's IEP team. The IEP team shall meet before the end of the 2023-2024 school year to develop an IEP for Student's 2024-2025 school year that is based on the comprehensive evaluation, and the behavioral/transition plan.

### (b) <u>Private School Placement</u>

Parents have not met their burden of proof on the placement of Student in a private school at District's expense. Parents are entitled to reimbursement for private school tuition only when both of the following factors are met: (1) that the public placement violated IDEA; and (2) the private school placement is proper. *Forest Grove Sch. Dist. v. T.A.,* 557 U.S. 230, 246 (2009) (quoting *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter,* 510 U.S. 7, 15 (1993)). The Eighth Circuit has held that in determining whether a private school placement is "proper," a

court or hearing officer must consider whether the private school placement is reasonably calculated to enable the student to receive educational benefits. *T.B. v. St. Joseph Sch. Dist.*, 677 F.3d 844 (8th Cir. 2012) (citing *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 207, 102 S. Ct. 3034 (1982)).

Although Parents have shown that the District failed to provide a FAPE, given a proper evaluation, the right therapists, and evidence-based programming, and with adequate Student attendance and parent participation, the District should be able to provide a FAPE to Student at a school other than Hunt. Those factors would also be present at the Grace School, an ideal environment where no doubt Student would receive a FAPE. Yet, an ideal educational environment is not what the IDEA requires. *Endrew F.*, 137 S. Ct. at 999 (stating that an IEP must be reasonable but does not have to be ideal). Additionally, questions remain unanswered about the Grace School, including its cost or even its street address. Furthermore, it is inequitable to allow Parents to ignore all of District's attempts at communication and to schedule the fifth-grade IEP conference, and then receive tuition reimbursement and transportation for a private school placement. Therefore, this hearing officer finds that placement at the Grace School is not proper at this time, the request to change Student's placement to the Grace School at District's expense is denied, and District is ordered to place Student at a school other than Hunt Elementary.

## VII.
## ORDER

IT IS, THEREFORE, ORDERED THAT:

1. Parents' request for District to pay for enrolling Student in a private school and transportation to and from the private school is DENIED; and

2. District is ORDERED to pay for an independent comprehensive evaluation of Student that complies with 34 CFR 300.304(c)(6), and that includes the assessments set forth in the Department's Eligibility Criteria & Program Guidelines for children with Autism. The independent evaluation shall be conducted within 45 days of the date of this Order and shall be conducted by a qualified examiner of Parent's choice;

3. District is ORDERED to pay for a functional behavioral analysis conducted by a BCBA of parent's choice who will develop (1) an Individual Behavior Plan for Student, and (2) a plan for transitioning Student back to school, which may include a trauma-trained RBT to work with Student in the educational environment under the BCBA's supervision, at District's expense. District shall include the Individual Behavior Plan in Student's IEP and the BCBA as a member of the IEP team at district's expense as long as Student's behavior plan requires it. The behavioral analysis shall be conducted within 45 days of the date of this Order; and

3. Before June 30, 2024, Student's IEP team shall meet to review the comprehensive evaluation, behavior analysis, and behavior plan/transition plan, and develop an IEP for the 2024-2025 school year with placement at a school other than Hunt Elementary.


## FINALITY OF ORDER AND RIGHT TO APPEAL:

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, Special Education and Related Services: Procedural Requirements and Program Standards, Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

*/s/ Cheryl L. Reinhart*
**Cheryl L. Reinhart,**
**Hearing Officer**

**Dated: March 29, 2024**